U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described**.

Signed August 29, 2008

United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| VALLECITO GAS, LLC, | § | Case No. 07-35674-11-BJH |
| | § | |
| Debtor. | § | |
| | § | |
| TIFFANY GAS CO., LLC, | § | |
| | § | |
| Plaintiff, | § | Adversary No. 08-03132-BJH |
| v. | § | |
| | § | |
| HARVEY LEON MORTON, | § | |
| CHAPTER 11 TRUSTEE, VALLECITO | § | |
| GAS, LLC, SANDIA DEVELOPMENT | § | |
| AND CONSULTING, INC., JOHN | § | |
| BURLE, BRIGGS-COCKERHAM LLC, | § | |
| BARRONS RESOURCES, LLC | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Motion for Summary Judgment (the "Motion") filed by Harvey Leon Morton, the duly appointed Chapter 11 Trustee of Vallecito Gas Co., LLC (the "Trustee"). The Court has core jurisdiction over this adversary proceeding in accordance with 28 U.S.C. §§ 1334 and 157(b). This Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

I. BACKGROUND FACTS[1]

On or about March 1, 2006, Tiffany and Vallecito entered into an agreement entitled "Agreement for Purchase and Sale of Navajo Lease Number I-89-IND-58, Associated Acreage, Production Equipment and Flowline System, San Juan County, New Mexico" (the "Agreement"). *See* Exhibit A to the Motion. The subject of the Agreement is a Mining Lease of Tribal Lands dated August 15, 1921, and commonly referred to as "Navajo Lease Number I-89-IND-58" (the "Hogback Lease"), which is located on the Navajo Nation (the "Nation"). *See* Exhibit E to the Motion. In the Agreement, Tiffany agreed to assign its interest in the Hogback Lease to Vallecito for the purchase price of $920,000 and other consideration stated in the Agreement. Because the Hogback Lease is located on the Nation, both the Nation and the Bureau of Indian Affairs ("BIA") were required to approve the assignment in order for it to become effective. Accordingly, Section 7 of the Agreement requires the approval of the Nation and the BIA prior to the transfer of any interest in the Hogback Lease to Vallecito. Section 7 provides:

> Governmental Approvals. Promptly after Closing, Seller and Buyer shall execute and Buyer shall file such additional documentation required to obtain the approval of the Lease and the transfer of formal operations thereon from Seller to Buyer by the Nation and the Bureau of Indian Affairs ("BIA") (collectively, the "Governmental

---

[1]None of the facts recited here are disputed.

**Memorandum Opinion and Order** **Page 2**

> Approvals"). Buyer shall be responsible for any filing fees or other assessments relating to the Governmental Approvals. In addition, Buyer shall take prompt measures to arrange for such bonding or other financial assurance as the Nation and/or the BIA may require in connection with the Governmental Approvals.

Agreement, Exhibit A to the Motion at § 7.

Because the assignment of the Hogback Lease would not become effective until both the Nation and the BIA approved the transaction, the Agreement also addresses the status of the parties during the period between the closing and the receipt of both approvals. In Section 9 of the Agreement, the parties agreed that Tiffany would continue to operate the Hogback Lease during that interim period, with all proceeds from Tiffany's operations going to Vallecito (after payment of a fee to Tiffany for operating the Hogback Lease). The parties further agreed that Vallecito would be restricted from drilling any new wells or conducting any surface-disturbing activities on the Hogback Lease until both approvals were received. Specifically, Section 9 of the Agreement provides:

> <u>Operations After Closing and Before Governmental Approvals</u>. As between Seller and Buyer, responsibility for operation of the Assets shall transfer from Seller to Buyer as of Closing. Notwithstanding this transfer of responsibility, Seller shall continue to serve as operator of the Assets as a nominee for Buyer from the Closing until the effective date of the Governmental Approvals. Buyer shall not be entitled to drill any new wells or conduct any other surface-disturbing activities on the Lease until (a) all Governmental Approvals have been obtained; and (b) all bonds and other financial assurance previously provided by Seller for operations of the Lease . . . have been released and replaced by bonds and other financial assurance submitted by Buyer and acceptable to the Nation and/or the BIA. If all Governmental Approvals have not been obtained as of August 30, 2006, Seller may request Buyer to advance the $24,000 annual rental payable under the Lease on or before October 31, 2006, and Buyer shall advance such amount to Seller within 15 days after receipt of such request

Agreement, Exhibit A to the Motion at § 9.

While this provision is the source of the parties' present dispute, Section 11 of the Agreement provides:

**Memorandum Opinion and Order**             Page 3

> <u>Nation's Failure to Approve Assignment</u>. In the event that the Nation has failed or declined to approve the assignment of the Lease from Settler to Buyer within one year after the Closing (or such longer period as the parties may hereafter agree), then, within 30 days after the expiration of such period, the Closing of the transactions contemplated in this Agreement shall be reversed and the Assets shall be reassigned from Buyer to Seller as of the Effective Date, free and clear of any burdens or encumbrances created by Buyer. Upon making such reassignment, Buyer shall be entitled to a refund of the Purchase Price from Seller less: (a) unless the Nation's failure to approve the assignment was caused by Seller's breach of its obligations under this Agreement, the amount of $100,000, and (b) an amount equal to the "Net Proceeds" received by Buyer for the period after the Effective Date. . . .

Agreement, Exhibit A to the Motion at § 11.

Although the Agreement was dated March 1, 2006, the parties amended the Agreement to revise the Effective Date to May 1, 2006. The closing date was likewise revised to May 1, 2006. *See* Exhibit B to the Motion.

The parties further agree that: (i) on or about May 10, 2006, Vallecito paid Tiffany the purchase price of $920,000.00 called for by the Agreement; (ii) on April 23, 2007, Tiffany and Vallecito agreed to extend the deadline called for by Section 11 of the Agreement until May 1, 2008, *see* Exhibit F to the Motion; (iii) the Nation approved the assignment of the Hogback Lease from Tiffany to Vallecito on November 7, 2007, *see* Exhibit G to the Motion; (iv) on or about May 1, 2008, Tiffany agreed to extend the deadline called for by Section 11 of the Agreement from May 1, 2008 until May 15, 2008; and (v) the BIA approved the assignment of the Hogback Lease from Tiffany to Vallecito on June 18, 2008.

## II.   CONTENTIONS OF THE PARTIES

In its adversary complaint, Tiffany seeks this Court's declaratory judgment that (i) the Agreement was subject to both Nation and BIA approval by the May 15, 2008 deadline, (ii) both approvals were not obtained by the deadline, (iii) the failure of the BIA to approve the Agreement

by the deadline renders the Nation's approval ineffective, (iv) Tiffany is entitled to reverse or rescind the Agreement and take back the Hogback Lease from Vallecito (subject to Tiffany's obligation to repay certain monies to Vallecito), and (v) Tiffany is entitled to terminate a certain payment order because both the Nation and the BIA did not approve the Agreement by the deadline.

In the Motion, the Trustee contends that (i) the Agreement is unambiguous, and (ii) by its express terms, Section 11 of the Agreement only required Nation approval of the Agreement by the May 15, 2008 deadline.[2] Because the Nation's approval was received prior to the deadline, the Trustee contends that Tiffany is not entitled to any of the relief it requested in its adversary complaint. In particular, according to the Trustee, because the Nation's approval was received prior to the deadline, Tiffany is not entitled to reverse or rescind the Agreement or to take back the Hogback Lease. Moreover, according to the Trustee, because all of Tiffany's other requested relief flows from a forfeiture of the Hogback Lease, those claims must also be denied. Finally, the Trustee contends that what Tiffany is really seeking through the Declaration of Joel B. Burr, Jr. (the "Burr Declaration") is to rewrite the Agreement to impose a requirement that is simply not there – *i.e.*, to impose a deadline by which both the Nation *and the BIA* had to approve the Agreement or the Hogback Lease would be forfeited. Accordingly, the Trustee seeks a summary judgment disposing of Tiffany's claims.

In contrast, Tiffany contends that the Motion should be denied because the Trustee's interpretation of the deadline provision set forth in Section 11 of the Agreement is contrary to the

---

[2]While the Motion only references a May 1, 2008 date to obtain Nation approval, the Court held a telephonic hearing with the parties on August 25, 2008, at which time counsel for the Trustee agreed that he had requested a further extension of the May 1, 2008 deadline set forth in Section 11 of the Agreement, which was granted by Tiffany until May 15, 2008.

**Memorandum Opinion and Order** **Page 5**

intent of the parties. According to Tiffany, Section 11 of the Agreement is ambiguous and extrinsic evidence is admissible to place the Agreement in its proper context. According to Tiffany's understanding of the Agreement, Section 11 requires that both the Nation and the BIA approve the assignment of the Hogback Lease from Tiffany to Vallecito by May 15, 2008. Tiffany asserts that: (i) the purpose of the deadline imposed by Section 11 was to place an end date on the period in which Tiffany was obligated to continue to operate the Hogback Lease prior to the receipt of the Governmental Approvals, *see* Burr Declaration, Tiffany's Brief, Exhibit C at ¶ 8; (ii) the reference to the approval of the Nation in Section 11 of the Agreement refers to the "effective approval of the assignment," which requires the approval of both the Nation and the BIA, and not just the Nation's preliminary approval, *id*. at ¶ 9; and (iii) because the BIA had not approved the assignment by May 15, 2008, Tiffany is entitled to a reversal of the transactions contemplated by the Agreement and the reassignment of the Hogback Lease to it. According to Tiffany, because it has raised a genuine issue of material fact as to whether the parties intended for the Section 11 deadline to apply to both the Nation and the BIA, granting the Motion is inappropriate.

## III.  LEGAL ANALYSIS

### A.  Summary Judgment Standard.

Summary judgment is proper if "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, and other matters presented to the Court show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *In re Ice Melt Products*, 344 B.R. 810, 813 (Bankr. N.D. Tex. 2006) (internal citations omitted). On summary judgment, all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 250 (1986). The movant bears the initial burden of articulating the basis for its motion and identifying evidence that shows that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant carries its burden, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

### B. Is the Agreement Ambiguous? [3]

The Agreement is governed by New Mexico law. *See* Agreement, Exhibit A to the Motion at § 6. Under New Mexico rules of contract construction, the Court is not confined to the four corners of the Agreement in deciding if it is unclear. Rather, according to the New Mexico Supreme Court in *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 509; 817 P.2d 238, 243 (1991), "in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." The *C.R. Anthony* court expressly overruled New Mexico case law to the contrary. The court noted that "[i]t is important to bear in mind that the meaning the court seeks to determine is the meaning one party (or both parties, as the circumstances may require) attached to a particular term or expression at the time the parties agreed to those provisions." *Id*. In distinguishing between the parol evidence rule, which "bars admission of evidence extrinsic to the contract to contradict and perhaps even to supplement the writing," the *C.R. Anthony* court stated that

---

[3]"Ambiguity...is best understood as a proxy for describing lack of clarity in the parties' expressions of mutual assent. The term, as it has been employed, incorporates a variety of conceptual problems including the distinctive notions of ambiguous syntax, ambiguous terms, vagueness, and general lack of clarity." *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 509; 817 P.2d 238, 243, n2 (1991).

> [t]he [parol evidence] rule should not bar introduction of evidence to explain terms. As Professor Corbin observes, no parol evidence that is offered can be said to vary or contradict a writing until by process of interpretation the meaning of the writing is determined. The operative question then becomes whether the evidence is offered to contradict the writing or to aid in its interpretation. We leave these distinctions to case-by-case development by our lower courts.

*Id*.

Finally, the *C.R. Anthony* court explained that "the question of whether a contractual term or provision is susceptible to reasonable but conflicting meanings, i.e., whether there is ambiguity, is one of law." *Id*. However, "if the court finds ambiguity, the jury (or the court as the fact finder in the absence of a jury) resolves the ambiguity as an issue of ultimate fact before deciding issues of breach and damages." *Id*.

So, according to the *C.R. Anthony* court, this Court is required to consider the extrinsic evidence offered by the parties in deciding the legal question of whether the Agreement is ambiguous.[4] If, after considering the extrinsic evidence, this Court concludes that "the evidence presented is so clear that no reasonable person would determine the issue before the court in any way but one," the question "may then be described as one of law," which this Court is entitled to dispose of without further evidence or hearing. *C.R. Anthony*, 112 N.M. at 510; 817 P.2d at 244. However, according to the *C.R. Anthony* court, "if the proffered evidence is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the ultimate factual issues must be resolved by [this Court] with the benefit of a full evidentiary hearing." *Id*.

---

[4] The *C.R. Anthony* court offered suggestions about how the extrinsic evidence could be considered while "preserv[ing] the integrity of the interpretation proces." *C.R. Anthony*, at 243, n4. According to the court, the extrinsic evidence could be presented through an offer of proof, it could be conditionally admitted subject to a motion to strike, or it could be provisionally received and then, if the court decides that the contract is reasonably susceptible to the offered interpretation, the court could admit the evidence in order to actually interpret the contract.

**Memorandum Opinion and Order** **Page 8**

The New Mexico Supreme Court had another opportunity to review and apply the principles announced in *C.R. Anthony* in *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 779; 845 P.2d 1232, 1233 (1993). In *Mark V*, the court discussed "the appropriate methods for a trial court to use in determining whether a contract contains ambiguous terms and in resolving any ambiguities thus discovered." *Id*. According to the *Mark V* court, following its prior decision in *C.R. Anthony*, New Mexico lower courts were instructed to no longer follow the "plain-meaning" or "four corners" standard, "under which ambiguity is determined by the court without consideration of any evidence outside the contract itself to explain the purposes or context of the contract." *Id*. Noting that "New Mexico law, then, allows the court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity," the *Mark V* court summarized New Mexico law of contract interpretation as follows:

> An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity. The question whether an agreement contains an ambiguity is a matter of law to be decided by the trial court. The court may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear. If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law. If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists. At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder.

*Id*. at 781; 845 P.2d at 1235.

In *Mark V*, the trial court determined that the contract was unambiguous as a matter law. In coming to this conclusion, however, the trial court refused to consider extrinsic evidence, instead looking only to the face of the contract. At issue there was dispute between a real estate agency and a property owner over a broker's commission. After presenting a buyer to the homeowners who was

willing to satisfy all of the homeowners' terms of sale, the parties to an exclusive-right-to-sell listing agreement signed an addendum to the agreement purporting to "cancel" all obligations between the parties. After considering the extrinsic evidence tendered to the trial court, the New Mexico Supreme Court concluded that

> [a] number of significant questions of intent and meaning arise from the parties' execution of the addendum. First, the addendum states that 'all obligations agreed to are hereby canceled.' Does the phrase include Mark V's commission or does it merely release Mark V from any further obligation to use diligence in procuring a purchaser? Mark V had allegedly brought a buyer to [the homeowners] and had thereby earned a commission of approximately $17,500.00. There was no evidence presented as to why Mark V would want to waive its right to this commission. Additionally, the addendum provided that [the homeowners'] obligation to pay a commission if the property were sold to someone procured by Mark V would continue for 365 days from the date the addendum was signed. Why would Mark V release [the homeowners] from a commission already owed and yet retain this term in the contract?

*Id*. at 782; 845 P.2d at 1236. Moreover, the court noted that the author of a leading treatise on contracts discusses the problems presented by an agreement to cancel or rescind a contract after one party has performed. Finding the agreement ambiguous, the *Mark V* court concluded that the trial court's grant of summary judgment was improper and remanded the case to the trial court to conduct the required evidentiary hearing in order to determine the factual issues presented by the addendum. *Id*. at 783; 845 P.2d at 1237.

Applying these principles here, the Court has reviewed the all of the documents submitted both in support of (Trustee Exhibits A-K), and in opposition to (Tiffany Exhibits A-E), the Motion. Among those documents are the Agreement, the Hogback Lease, various modifications to the Agreement signed by the parties, the Affidavit of Michael Briggs, (Vallecito's principal) (the "Briggs Affidavit"), and the Burr Declaration (Tiffany's principal). Initially, the Court notes that the language

of the Agreement itself and certain of the modification documents suggest that those documents were carefully drafted using various defined terms. As relevant here, the Navaho Nation is defined in Section 1 of the Agreement as the "Nation." *See* Agreement, Exhibit A to the Motion at § 1. The Bureau of Indian Affairs is defined in Section 7 of the Agreement as the "BIA." *Id*. at § 7. In that same section of the Agreement, the approvals required of the Nation and the BIA are defined collectively as the "Governmental Approvals." *Id*. Those three definitions are critical to an understanding of the express terms of the Agreement.

Moreover, the express terms of the Agreement distinguish between the Nation's approval of the assignment of the Hogback Lease and who will be responsible for the operation of the Hogback Lease pending Governmental Approvals. Section 9 of the Agreement dictates the relative responsibilities of Vallecito and Tiffany after the Closing and before "Governmental Approvals" are received. *Id*. at § 9. In summary, while responsibility for the operation of the Hogback Lease transferred from Tiffany to Vallecito as of the Closing, Tiffany was required to continue to serve as the operator of the Hogback Lease as Vallecito's nominee until all Governmental Approvals – *i.e.*, both the Nation and the BIA – were received. Moreover, in accordance with the express terms of the Agreement, Vallecito was not entitled to do certain things on the Hogback Lease – *i.e.*, drill any new wells or conduct any other surface-disturbing activities – until all Governmental Approvals were obtained. So, in other words, the parties clearly agreed that until both the Nation and the BIA approved the Agreement, Tiffany was required to remain as the operator of the Hogback Lease and Vallecito could not drill new wells or otherwise disturb the surface of the land. Finally, in the event the required Governmental Approvals were not obtained by August 30, 2006 (later extended until August 30, 2007), Tiffany could require Vallecito to advance the annual rental payable under the

Hogback Lease to it by a date certain (also extended later).

In contrast, Section 11 of the Agreement, by its express terms, only requires the Nation's approval of the assignment of the Hogback Lease from Tiffany to Vallecito by May 15, 2008. Moreover, on April 27, 2007, Tiffany and Vallecito entered into a Second Amendment to the Agreement (the "Second Amendment"). *See* Exhibit F to the Motion. The distinction between Governmental Approvals and the Nation's approval is perpetuated in the Second Amendment signed by the parties more than a year after the Agreement was originally signed. Specifically, the Second Amendment extends the deadline set forth in Section 11 of the Agreement for Nation approval from May 1, 2007 to May 1, 2008. Moreover, the deadline for Governmental Approvals set forth in Section 9 of the Agreement was extended to August 30, 2007.[5]

Tiffany argues, however, that notwithstanding the actual language used in the Agreement and the Second Amendment, when the context surrounding the execution of the Agreement is considered, the Agreement is unclear. Specifically, Tiffany argues that Section 11 of the Agreement is unclear because Tiffany believes the parties intended to impose a requirement that both the Nation and the BIA approve the assignment of the Hogback Lease from Tiffany to Vallecito by May 15, 2008, and that if such approvals were not received timely, the transaction would be unwound and Tiffany would refund the purchase price to Vallecito. Burr Declaration at ¶ 7. In other words, according to Tiffany, the reference to the approval of the Nation in Section 11 of the Agreement refers to the "effective approval of the assignment," which requires the approval of both the Nation

---

[5]Tiffany's argument that the parties intended when the Agreement was signed that the Nation's approval in Section 11 meant "effective approvals" – *i.e.*, both the Nation and the BIA – makes no sense in light of the language of the Second Amendment that continues the Agreement's distinction between Nation approval and Governmental Approvals. If Nation approval really meant both, there would have been no reason to use the term Governmental Approvals later in the same paragraph of the Second Amendment.

and the BIA, and not just the Nation's preliminary approval. *Id*. at ¶ 9. According to Tiffany, this is so because Tiffany never intended to have to continue as the operator of the Hogback Lease indefinitely. *Id*. at ¶ 8. Finally, Burr states that when Tiffany entered into the transaction, it expected that both of the required Governmental Approvals would be received in less than a year (based in part on Tiffany's prior assignment of the Hogback Lease from Amoco Production Company in less than a year), and that expectation led to the inclusion of the one-year deadline in Section 11 of the Agreement. *Id*. at ¶¶ 10 & 11.

The Burr Declaration has raised inconsistencies between the express language of the Agreement and the Second Amendment on the one hand and Tiffany's statement of the parties' intention when entering into those agreements and the context in which Tiffany acted on the other hand. Complicating the analysis further, Vallecito disputes Tiffany's statement of the parties' intentions when entering into the Agreement. Briggs states that (i) he was the principal negotiator for Vallecito in connection with the Agreement, (ii) Tiffany and Vallecito were aware that the purchase and sale of the Hogback Lease required the approval of the Nation and the BIA, (iii) the parties negotiated for a deadline for only Nation approval, (iv) Tiffany and Vallecito were aware that the approval of the BIA could take a substantial period of time, and (v) for that reason, Tiffany was provided the right to operate the Hogback Lease for five years. *See* Briggs Affidavit, Exhibit D to the Motion, at ¶¶ 8-10.

Given New Mexico's rejection of the "plain meaning" standard of contract interpretation, the Court cannot decide the meaning of the Agreement based solely upon the language of the Agreement. Rather, the Court is required to consider the proffered extrinsic evidence to determine whether there is a "lack of clarity in the parties' expressions of mutual assent." *C.R. Anthony*, 112

**Memorandum Opinion and Order** **Page 13**

N.M. at 509; 817 P.2d at 243, n2. Accordingly, the Court must decide what to do, if anything, with the inconsistencies between Burr's testimony regarding what the parties intended generally (and what he says Tiffany intended specifically), on the one hand, and Briggs's testimony regarding what he says the parties understood and intended in the Agreement on the other hand – all in light of the expression of the parties' mutual assent as set forth in the Agreement itself.

After carefully considering the proffered extrinsic evidence, the Court concludes that the "parties' expressions of mutual assent" regarding the assignment of the Hogback Lease is clear. The parties' clearly distinguished between Nation approval and Governmental Approvals in the Agreement through carefully crafted defined terms, and chose to set a deadline by which Tiffany could elect to rescind the Agreement based only upon a lack of Nation approval. *See* Agreement, Exhibit A to the Motion at § 11. Moreover, the Agreement clearly provides what the parties can, and cannot do, after the Closing and prior to receipt of Governmental Approvals. *Id*. at § 9. Over a year later, the parties signed the Second Amendment that, within a four sentence paragraph, perpetuates the clear distinction drawn in the Agreement between Nation approval (required by Section 11 of the Agreement) and Governmental Approvals (required by Sections 7 and 9 of the Agreement). *See* Exhibit G to the Motion.

If Burr's assertion that the parties "reference to the approval of the Nation in Section 11 of the Agreement refers to the effective approval of the assignment, which requires the approval of both the Nation and the BIA, and not just the Nation's preliminary approval," Burr Declaration at § 9, why did Tiffany sign the Second Amendment which clearly uses both terms within a four sentence paragraph? *See* Exhibit G to the Motion (second paragraph). Moreover, if Burr truly believes that Nation approval as used in Section 11 of the Agreement means both the Nation and the BIA, why

**Memorandum Opinion and Order** **Page 14**

not simply use Nation approval throughout the second paragraph of the Second Amendment, and avoid the use of the term Governmental Approval altogether? [6]

While the Court is required to consider "evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance," according to the New Mexico Supreme Court, it does so "in order to decide whether the meaning of a term or expression contained in the agreement is actually unclear." *C.R. Anthony*, 112 N.M. at 508-09; 817 P.2d at 242-43. The Burr Declaration may contain "evidence of the circumstances surrounding the making of the contract," but it does not shed light on a term or expression in the Agreement that lacks clarity. Rather, the extrinsic evidence Burr asks this Court to consider seeks to modify what was otherwise clearly expressed in the Agreement and perpetuated by mutual assent in the Second Amendment. The other extrinsic evidence proffered – *i.e.*, the Briggs Affidavit – simply states that the parties intended to do exactly what the Agreement says they intended to do. In other words, according to Briggs, the parties intended to impose a deadline triggering possible forfeiture of the Hogback Lease only if "Nation approval" was not received timely and the parties intended to define the relative rights and obligations of Vallecito and Tiffany after the "Closing" and before "Governmental Approvals" were received. After considering this extrinsic evidence, the Court concludes that there is (i) no term or expression contained in the Agreement that is actually unclear and (ii) no fact question here because the Agreement "is not reasonably and fairly susceptible of different constructions." *C.R. Anthony*, 112 N.M. at 509; 817 P.2d at 243, n4; *See also Mark V*, 114 N.M. at 781; 845 P.2d at 1235. The Agreement only requires Nation approval of the

---

[6] When Tiffany's counsel was asked this question at the hearing on the Motion, he had no answer, other than to state that Burr did not address that issue in his declaration.

**Memorandum Opinion and Order** **Page 15**

assignment of the Hogback Lease by May 15, 2008 (the final extended date).

Contrast this conclusion with the circumstances present in *Mark V*. There, the parties executed a standard form addendum to their real estate listing agreement that consisted of five paragraphs that could be completed and signed by the parties. Three of the paragraphs were left blank. One paragraph was crossed out. The only remaining paragraph, paragraph 4, entitled "Cancellation Agreement," was signed by the parties. It provided that "[t]he above mentioned Listing Agreement is hereby terminated effective this date and all obligations agreed to are hereby canceled...." *Mark V*, 114 N.M. at 780; 845 P.2d at 1234. It further provided that if at any time within the next 365 days the property should be sold to any person who had been shown the property during the term of Mark V's listing, Mark V would be entitled to a six percent commission on the sale. *Id*.

As noted previously, the New Mexico Supreme Court concluded, after considering the proffered extrinsic evidence, that a term or expression contained in the addendum was unclear – *i.e.*, the term "canceled." According to the court,

> [d]oes the phrase [canceled] include Mark V's commission or does it merely release Mark V from any further obligation to use diligence in procuring a purchaser? Mark V had allegedly brought a buyer to [the homeowners] and had thereby earned a commission of approximately $17,500.00. There was no evidence presented as to why Mark V would want to waive its right to this commission. Additionally, the addendum provided that [the homeowners'] obligation to pay a commission if the property were sold to someone procured by Mark V would continue for 365 days from the date the addendum was signed. Why would Mark V release [the homeowners] from a commission already owed and yet retain this term in the contract?"

*Mark V*, 114 N.M. at 782; 845 P.2d t 1236. Because a term or expression contained in the addendum was "reasonably and fairly susceptible of different constructions, an ambiguity exist[ed]," that could

only be resolved by the finder of fact after a full evidentiary hearing. *Id*.

Here, there is no term or expression contained in the Agreement that is "reasonably and fairly susceptible of different constructions." If the parties intended to include BIA approval as a mandatory prerequisite, they have shown themselves, as demonstrated by the other provisions in the Agreement, completely capable of doing so. Therefore, when considering the totality of the circumstances, Tiffany's proffered interpretation of the Agreement does not "clarify or explain". *C.R. Anthony*, 112 N.M. at 511; 817 P.2d at 245. In fact, Tiffany's interpretation of the Agreement violates the tenets of contract interpretation espoused in *C.R. Anthony* by "add[ing] to the...agreement a new provision" *Id*. Accordingly, this Court concludes that there is no ambiguity in the Agreement and no question of fact upon which to go to trial.

## IV.   CONCLUSION

Given current oil and gas prices, it is understandable why Tiffany hopes to compel a forfeiture of the Hogback Lease from the Debtor. However, the Nation approved the assignment of the Hogback Lease to Vallecito well within the required deadline. There is no basis upon which to conclude that Tiffany is entitled to compel a forfeiture of the Hogback Lease in accordance with the terms of the Agreement. Accordingly, the Motion is granted.

**SO ORDERED**.

**### End of Memorandum Opinion and Order ###**